UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:07-CV-500-FL

| WALLACE DUNLAP, | ) | |
|---|---|---|
| Plaintiff | ) | |
| v. | ) | **MEMORANDUM AND RECOMMENDATION** |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | |
| Defendant. | ) | |

This matter is before the Court on the parties' cross motions for Judgment on the Pleadings **[DE's 22 & 25]**. The time for the parties to file any responses or replies has expired. Accordingly, these motions are now ripe for adjudication. The underlying action seeks judicial review of the final decision by the Defendant denying Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Pursuant to 28 U.S.C. § 636(b)(1), this matter is before the undersigned for a memorandum and recommendation. For the reasons set forth herein, the undersigned RECOMMENDS that Plaintiff's Motion for Judgment on the Pleadings **[DE-22]** be DENIED IN PART AND GRANTED IN PART, and that Defendant's Motion for Judgment on the Pleadings **[DE-25]** be DENIED IN PART AND GRANTED IN PART.

**Statement of the Case**

Plaintiff applied for DIB and SSI on November 9, 2004, alleging that he became

unable to work on May 15, 2004,[1] due to post-traumatic stress disorder ("PTSD") and a thyroid impairment. [Tr. 59-61, 71]. These applications were denied at the initial and reconsideration levels of review. [Tr. 49-50, 52-56]. A hearing was held on December 20, 2006, before an Administrative Law Judge ("ALJ") who found Plaintiff was not disabled during the relevant time period in a decision dated January 9, 2007. [Tr. 13-21]. On November 1, 2007, the Appeals Council denied Plaintiff's request for review, thus rendering the ALJ's decision the final decision of the Defendant. [Tr. 5-8]. Plaintiff filed the instant action on December 27, 2007. **[DE-1]**.

## **Standard of Review**

This Court is authorized to review the Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . .

Id.

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more

---

[1] In Plaintiff's application for DIB and SSI, he noted that his disability began on May 15, 2004. [Tr. 59, 64]. However, in Plaintiff's Disability Report, he lists May 1, 2004, as the date that he became unable to work due to his disability. Id. at 71. The Court will use the date that is listed in Plaintiff's application for DIB and SSI.

than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether the Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

## Analysis

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process which must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the five-step evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment. [Tr. 18]. At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: 1) PTSD;

2) personality disorder; 3) hypothyroidism; 4) and a history of alcoholism in remission. [Tr. 18]. In completing step three, however, the ALJ concluded that these impairments were not severe enough to meet or medically equal, either singly or in combination, to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. [Tr. 18].

The ALJ then proceeded with step four of his analysis and determined that Plaintiff retained the residual functional capacity ("RFC") to perform work at a medium level of exertion, which involves simple, routine, repetitive tasks with occasional and limited interaction with co-workers, and no dealings with the public. [Tr. 19]. In addition, a Vocational Expert ("VE") testified at the hearing that Plaintiff's past relevant work as a general laborer was unskilled and required medium exertion. [Tr. 19]. After taking all of these factors into account, at step five of his analysis, the ALJ concluded that Plaintiff could return to his past relevant work as a general laborer, and that Plaintiff is not disabled. [Tr. 19]. The evidence relied upon by the ALJ shall now be summarized.

Plaintiff served in Vietnam from March 1970 through March 1971. [Tr. 19, 152]. While in Vietnam, Plaintiff was a helicopter crew chief and witnessed the injuries and deaths of numerous fellow soldiers. [Tr. 19, 152]. As a result, since he returned from Vietnam, Plaintiff has suffered from PTSD with symptoms of daily intrusive thoughts, nightly distressing dreams, daily flashbacks, and sleep disturbance. [Tr. 19, 152-53].

On May 27, 2003, Dr. John C. Lindgren evaluated Plaintiff for a psychiatric exam [Tr. 19, 152]. During the exam, the doctor noted that Plaintiff was anxious and irritable, but did not have any hallucinations, delusions, or suicidal or homicidal ideations. [Tr. 19, 153]. In addition, his cognition was grossly intact and his judgment and insight were fair. [Tr. 19,

153]. Dr. Lindgren diagnosed Plaintiff with PTSD, chronic alcohol abuse and dependence, and a Global Assessment of Functioning (GAF)[2] of 30.[3] [Tr. 19, 152-53]. He prescribed Paxil for treatment of his conditions. [Tr. 19, 152-53]. On the same day of Plaintiff's visit, Dr. Lindgren wrote a letter to the North Carolina Division of Veteran Affairs ("NCVA") and opined that "[b]ecause of [his] service-connected post-traumatic stress disorder, Mr. Dunlap is unable to sustain social relationships. He is also unable to sustain work relationships. Therefore, I consider him permanently and totally disabled and unemployable." [Tr. 153]. The doctor instructed Plaintiff to return for a visit in six weeks for a routine medication check. [Tr. 154].

However, Plaintiff did not return to visit Dr. Lindgren in six weeks; instead he returned to visit him seven months later on January 6, 2004. [Tr. 156]. During this visit, the doctor noted that Plaintiff was pleasant and cooperative, his mood was anxious, his thought process was linear, and he had no hallucinations, delusions, or suicidal or homicidal ideation. [Tr. 156]. In addition, his cognition was grossly intact, and his judgment and insight were fair. [Tr. 156]. Plaintiff reported that he had discontinued taking the Paxil because of the side effects. [Tr. 156]. However, Dr. Lindgren prescribed Seroquel because Plaintiff continued to have problems with anxiety and insomnia. [Tr. 156].

---

[2] The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The scale ranges from 0 to 100, with serious impairment in functioning at a score below 50. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994).[DE-26, p. 3, n. 2].

[3] A GAF of 21 to 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g. sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home or friends)." Diagnostic and Statistical Manual Disorders (DSM-IV), 32 (4th ed. 1994) (emphasis in original omitted). [DE-26, p. 3, n. 3].

On January 6, 2004, Dr. Lindgren wrote another letter to the NCVA. [Tr. 155]. The doctor reported that Plaintiff continued to have PTSD symptoms, including intrusive thoughts, distressing dreams, flashbacks, distress at exposure to triggers, sleep disturbance, inability to recall important aspects of trauma, estrangement and detachment from others, irritability and anger outbursts, memory problems, and hypervigilance. [Tr. 155]. He also indicated that since his last visit in May 2003, Plaintiff had continuous panic and anxiety symptoms, which affected his ability to function appropriately in a work setting. [Tr. 155]. He concluded that Plaintiff "is unable to establish and maintain effective work relationships in the work setting and in other settings." [Tr. 155].

Plaintiff returned to visit Dr. Lindgren for a routine medication check on February 17, 2004. [Tr. 20, 154]. During the visit, Plaintiff reported that taking the Seroquel significantly improved his sleep patterns and there were no side effects. [Tr. 20, 154]. In addition, Plaintiff's mental status exam revealed that he was pleasant and cooperative, but had some anxiety. [Tr. 20, 154]. The doctor also noted that Plaintiff's thought process was linear; he had no hallucinations, delusions, or suicidal or homicidal ideation; his cognition was grossly intact and his judgment and insight were fair. [Tr. 20, 154]. Dr. Lindgren instructed Plaintiff to continue taking the Seroquel for his sleep problems, and prescribed Lexapro to target his anxiety and depressive symptoms. [Tr. 20, 154]. Plaintiff was supposed to return for a visit in six weeks for a medication check, however, this was the last time that Dr. Lindgren evaluated him. [Tr. 20, 154].

Subsequently, on May 19, 2004, Plaintiff had a one time visit with Dr. Kathy Mayo. [Tr. 20, 159-61]. During the visit, Plaintiff reported that the Lexapro and Seroquel, were

helping to some degree because he was able to sleep better. [Tr. 20, 160]. Dr. Mayo observed that Plaintiff was pleasant, cooperative, and appeared to be a good historian, but his mood was angry and depressed. [Tr. 20, 160]. She also indicated that Plaintiff's speech was normal and spontaneous, he had no problems with psychosis, and he did not have any hallucinations or delusions. [Tr. 20, 160]. In addition, Plaintiff was oriented to person, place, and time, his memory was intact, and he had no homicidal or suicidal ideations. [Tr. 20, 160]. Dr. Mayo diagnosed Plaintiff with PTSD, chronic alcoholism in remission, and a current GAF of 35.[4] [Tr. 20, 160]. She also opined that "[Plaintiff] is not able to keep a job due to his anger and irritability. He also has difficulty with social relationships. I feel that he is not able to work at the current time." [Tr. 20, 161].

In addition to his other ailments, Plaintiff has a history of hyperthyroidism and Graves' disease. His medical records reveal that on July 26, 2004 and on October 3, 2004, Plaintiff's T4 level was at the normal range and his TSH level was low. [Tr. 19, 162, 188-91]. On October 20, 2004, Plaintiff's T4 level was slightly below normal and indicated a very slightly underactive gland due to the Methimazole that he was taking for his condition. [Tr. 19, 192]. Because his TSH remained low, Plaintiff agreed to undergo radio-iodine ablation for his thyroid gland. [Tr. 19, 192].

In February 2005, Plaintiff reported that he was experiencing double vision secondary to his hyperthyroidism. [Tr. 19, 320]. He was instructed to wear an eye patch to eliminate

---

[4] A GAF of 31 to 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." <u>Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)</u>, at 32 (4th ed. 1994) (emphasis in original omitted). [DE-26, p. 5, n. 4].

diplopia, and received synthroid treatments. [Tr. 20, 323]. When he went for a follow-up visit, in May 2005, Plaintiff reported to Dr. Robert Fagle that he was feeling much better since receiving the synthroid treatments for the past two months. [Tr. 20, 338]. He also indicated that his energy level was back to baseline and there were improvements in his other symptoms. [Tr. 20, 338-39].

On December 9, 2004, Plaintiff was evaluated by DDS consultant, Dr. Anthony G. Carraway. [Tr. 19, 214-16]. During the evaluation, Plaintiff denied any depressive symptoms including deional variation, early morning awakening, and other neurovegetative symptoms. [Tr. 19, 214-16]. Based on his own observations, Dr. Carraway noted that Plaintiff did "not endorse any current depressive symptoms," but did make exaggerated facial expressions and was quite histrionic and theatrical. [Tr. 19, 215-16]. Ultimately, the doctor concluded that Plaintiff's symptoms were consistent with chronic PTSD and prominent histrionic personality traits; he diagnosed him with a GAF of 63.[5] [Tr. 19, 216]. He also indicated that Plaintiff did not display any impairments of short term or immediate memory; his attention and concentration were intact; his ability to understand, retain, and perform instructions was not impaired; and he had the ability to perform simple and repetitive tasks. [Tr. 19, 216].

Over the next several of months, Plaintiff was evaluated by several DDS examiners. On December 29, 2004, a DDS examiner completed a Psychiatric Review Technique form

---

[5] A GAF of 61 to 70 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), at 32 (4th ed. 1994) (emphasis in original omitted). [DE-26, p. 26, n. 5].

for the period of May 1, 2004 to December 29, 2004. [Tr. 218-31].[6] The examiner noted that Plaintiff had anxiety, personality, and substance addiction disorders. [Tr. 218]. However, the examiner concluded that Plaintiff did not have any restrictions in his activities of daily living, only mild difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. [Tr. 228].

The record reveals that a DDS examiner evaluated Plaintiff for a Mental Residual Functional Capacity Assessment. [Tr. 232-35].[7] The examiner indicated that Plaintiff was moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors. In addition, he was also moderately limited in his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. [Tr. 234]. However, the examiner did not indicate that Plaintiff was significantly limited in any other area. [Tr. 232, 234].

On December 30, 2004, Dr. David Buchin, a DDS physician, completed a Physical Residual Functional Capacity Assessment form. [Tr. 237 - 42]. The doctor opined that Plaintiff could lift fifty pounds occasionally, twenty-five pounds frequently, stand and/or walk about six hours in an eight hour workday, sit about six hours in an eight-hour workday, and perform unlimited pushing and/or pulling in an eight hour workday. [Tr. 237A]. The doctor also noted that Plaintiff did not have any postural, manipulative, visual, communicative, or environmental limitations. [Tr. 237B-239]. Based on these observations,

---

[6] The signature and date blocks of this form were never completed. Id. at 218.

[7] The signature and date blocks of this form were never completed. Id. at 232.

he concluded that Plaintiff should be restricted to a medium RFC. [Tr. 242].

On that same day, Dr. Katherine V. Raleigh, a DDS psychologist, completed a Mental Residual Functional Capacity Assessment. [Tr. 243-46]. She opined that Plaintiff was moderately limited in several areas including: 1) his ability to work in coordination with or proximity to others without being distracted by them; 2) his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 3) the ability to interact appropriately with the general public; 4) the ability to accept instructions and respond appropriately to criticism from supervisors; 5) the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and 6) the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. [Tr. 243, 245]. However, the doctor did not indicate that Plaintiff had any other significant limitations. [Tr. 243, 245]. Ultimately, she concluded that Plaintiff was able to perform simple tasks at a non-rapid pace, in a non-public setting, with little interpersonal contact. [Tr. 246].

Dr. Raleigh also completed a Psychiatric Technique Review form on December 30, 2004, based on the period from May 1, 2004 to December 29, 2004. [Tr. 248-61]. She observed that Plaintiff was moderately limited in his difficulties in maintaining social functioning, and mildly limited in his difficulties in maintaining concentration, persistence, or pace, but had no restrictions in the activities of his daily living, and no episodes of decompensation. [Tr. 258].

Subsequently, on February 15, 2005, Dr. Margaret Parish, a DDS physician, affirmed

Dr. Buchin's earlier RFC assessment, that Plaintiff is able to perform a full range of medium work activity. [Tr. 291]. Two weeks later, on February 28, 2005, Dr. Edmunds affirmed Dr. Raleigh's earlier mental residual functional capacity assessment. [Tr. 277].

Several months later, on May 25, 2005, Plaintiff was evaluated by Ruby Cunning, MSW, LCSW. [Tr. 331-35]. Plaintiff had been referred to Ms. Cunning by Dr. Fagle for a mental health evaluation and treatment of his PTSD. [Tr. 331]. During his evaluation, Plaintiff indicated that he felt he needed therapy for his ongoing issues, but did not want to be medicated. [Tr. 331, 334]. Ms. Cunning observed that Plaintiff's speech was normal, but somewhat pressured, and his mood was anxious but appropriate. [Tr. 334]. In addition, Plaintiff did not have suicidal or homicidal ideation, there was no visual or auditory hallucinations, or delusions, and his insight and judgment were characterized as fair and good. [Tr. 334]. Ultimately, Ms. Cunning diagnosed Plaintiff with a GAF of 60 and recommended a referral to a psychiatrist for further evaluation. [Tr. 335].[8]

Plaintiff returned to visit Ms. Cunning on June 14, 2005. [Tr. 19, 426]. During this visit, Ms. Cunning noted that Plaintiff's speech was clear, and his language was articulate, descriptive, and logical. [Tr. 427]. She also noted that his mood was manic at times, his affect was congruent with his mood, his thought processes were normal, and his insight and judgment were good. [Tr. 427]. Based on these observations, Ms. Cunning assessed Plaintiff's GAF score at a 68, and recommended that he continue with individual therapy.

---

[8] A GAF of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), at 32 (4th ed. 1994) (emphasis in original omitted). [DE-26, p. 10, n. 8].

[Tr. 19, 427].

A few weeks later, Plaintiff was evaluated by Dr. Brian T. Smith. [Tr. 19, 424]. Dr. Smith reported that Plaintiff did not have any deficits in orientation, he was alert, his psychomotor activity was within normal limits, his speech was spontaneous, clear, and coherent, his thoughts were fairly organized and goal directed, and he did not demonstrate psychosis or mania. [Tr. 19, 425]. In addition, the doctor assessed Plaintiff's GAF score at a 70 to 75; a direct result of "ongoing counseling, without which, it would likely be lower."[9] [Tr. 19, 425]. The doctor also reported that although Plaintiff appeared to be fairly stable at that time, Plaintiff indicated that he did not want to be treated with any medications; counseling alone was enough. [Tr. 19, 425].

A month after his visits with Ms. Cunning and Dr. Smith, Plaintiff was examined by a clinical social worker, Paul Robb, LCSW, on July 28, 2005. [Tr. 19, 422]. Mr. Robb noted that during his exam, Plaintiff's speech was normal, his mood was calm, and he appeared to be able to speak comfortably with no goiter. [Tr. 19, 422]. In addition, Plaintiff's thought processes were normal, logical, and coherent, he did not have any hallucinations, or homicidal or suicidal ideations, he was fully alert as to person, place, time, and location, and his judgment and insight were good. [Tr. 19, 422]. Mr. Robb assessed Plaintiff's GAF score at a 69 and he recommended that Plaintiff continue therapy. [Tr. 19, 423].

During the hearing in this matter, Plaintiff testified that he was prescribed Valium,

---

[9] A GAF of 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychological stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), at 32 (4th ed. 1994) (emphasis in original omitted). [DE-26, p. 11, n. 9].

Paxil, Lexapro, Seroquel, and Zoloft for his conditions, but had to discontinue the Zoloft because it made him feel ill and lethargic. [Tr. 20, 475-76]. Plaintiff also reported that sometimes his medications interfered with his ability to focus. [Tr. 20, 482-83]. In addition, he indicated that he had problems with sleeping for more than 30 years, he had flashbacks that were triggered by the Iraq war, he lashed out at people at work, and he had memory loss, which is consistent with his PTSD. [Tr. 481, 483]. He testified that his daily activities involved watching television, reading a book, or riding his bicycle to the airport to watch airplanes. [Tr. 20, 486]. He also stated that he has had several jobs in the past including work in a junk yard, as a parts washer for a mechanic, as a receiving clerk, and he owned his own gun shop for several years. [Tr. 478, 488-90].

With regards to Plaintiff's testimony, the ALJ made the following findings:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.
> . . . .
> The undersigned finds that there are inconsistencies in the medical evidence and the claimant's testimony is also not consistent with the medical evidence.

[Tr. at 20].

The ALJ also consulted a medical expert, Dr. Nathan Strahl. [Tr. 21, 490-502]. Dr. Strahl is a psychiatrist and had experience working for the Veterans Administration. [Tr. 492]. Before testifying, Dr. Strahl asked Plaintiff several questions about his past alcohol abuse and his daily activities. [Tr. 492-93]. Dr. Strahl then discussed Plaintiff's PTSD and how it could impact his future employment. [Tr. 493-502]. Specifically, Dr. Strahl agreed

with Dr. Carraway's assessment that Plaintiff had no impairment of his memory, attention, or concentration, and is able to perform simple, routine, repetitive tasks. [Tr. 21, 495]. Ultimately, Dr. Strahl concluded that Plaintiff might be successful in the workplace if he was limited to a specific type of job; one that would minimize interpersonal interactions and stress. [Tr. 501].

In addition to Dr. Strahl's testimony, the ALJ also considered the testimony of a VE, Dr. Dixon Pearsall. [Tr. 21, 503-505]. The ALJ gave Dr. Pearsall a hypothetical that outlined the workplace restrictions that Dr. Strahl had articulated. [Tr. 504-505]. Based on these limitations, Dr. Pearsall testified that Plaintiff could return to his past relevant work as a parts salvage washer under the general laborer category in the Dictionary of Occupational Titles. [Tr. 21, 505]. This position was unskilled, required medium exertion, and would have the least amount of direct supervision. [Tr. 21, 504-506].

After weighing all of this testimony, the ALJ concluded that Plaintiff could return to his past relevant work because he is able to perform all of the nonexertional requirements of that job. [Tr. 20]. In addition, the ALJ opined that Plaintiff is able to work at a medium level of exertion that involves simple, routine, repetitive tasks, limited interpersonal interaction with co-workers, and no dealings with the public. [Tr. 20]. Accordingly, the ALJ found that Plaintiff had not been under a disability as defined by the Social Security Act from May 1, 2004 through the date of his decision. [Tr. 20].

The undersigned shall now address Plaintiff's assignment of error.

### **Assignments of Error**

Plaintiff's asserts numerous assignments of error. First, he asserts that the ALJ erred

by failing to "give the medical opinion of [his] treating physician . . . , sufficient weight." **[DE-22-2, p. 10-14]**. In addition, Plaintiff argues that the ALJ should not have relied on the opinions of the DDS consultants. Id. at 13-14. Finally, Plaintiff contends that the ALJ committed error by not weighing or considering the Department of Veteran Affairs' ("VA") disability determinations. Id. at 13. The Court will address each argument in turn.

**1.      Treating Physician's Opinion**

Plaintiff asserts that his treating physician's opinion should have been given more weight in the ALJ's determination of his RFC. **[DE-22-2, p. 10]**. "Objective medical facts and the opinions and diagnoses of the treating and examining doctors constitute a major part of the proof to be considered in a disability case and may not be discounted by the  ALJ." McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983). In general, the ALJ should give more weight to a treating physician's opinion because this physician usually provides "a detailed, longitudinal picture" of a claimant's alleged impairments. 20 C.F.R. §§ 404.1527 (d)(2), 416.927(d)(2) (2008).  However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given a controlling weight.'" Craig, 76 F.3d at 590 (quoting Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992) (per curiam)).  In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590.  Thus, "an ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has not given good reason for the weight afforded a particular opinion." Koonce v. Apfel, No.

98-1144, 1999 U.S. App. LEXIS 307, *7 (4th Cir.1999) (internal quotations omitted).

Dr. John C. Lindgren was Plaintiff's treating physician. Plaintiff's medical records reveal that Dr. Lindgren evaluated him on three separate occasions over an eighth month period. [Tr. 152-56]. After his first examination, on May 27, 2003, Dr. Lindgren wrote a letter to the NCVA. [Tr. 152-53]. In the letter, the doctor indicated that Plaintiff's GAF score was a 30 and concluded that "[b]ecause of [Plaintiff's] service-connected post-traumatic stress disorder . . . he consider[ed] him permanently and totally disabled and unemployable." [Tr. 152-53].

Plaintiff's second visit with Dr. Lindgren occurred seven months later on January 6, 2004. [Tr. 156]. After this visit, the doctor wrote another letter to the NCVA, updating them on Plaintiff's PTSD symptoms. [Tr. 155]. He indicated that since his last visit, in May 2003, Plaintiff had to change jobs because of his difficulty in adapting to stressful situations. [Tr. 155]. Thus, the doctor concluded that because Plaintiff "suffers near continuous panic and anxiety symptoms [it] affect[s] [his] ability to function appropriately in the work setting." [Tr. 155].

Plaintiff's final visit with Dr. Lindgren occurred on February 17, 2004, two months before the alleged onset date of his disability. [Tr. 155]. During this visit, Plaintiff reported significant improvement and received a prescription for Lexapro to treat his continued anxiety and depressive symptoms. [Tr. 154].

In the ALJ's RFC determination, he included some of Dr. Lindgren's findings in his analysis. [Tr.19, 20]. However, he ultimately rejected the doctor's opinion that Plaintiff was

"permanently and totally disabled and unemployable" because it was inconsistent with substantial evidence in the record. **[DE-22-2, p. 11]**; [Tr. 153]. To illustrate, when Plaintiff was examined by several DDS consultants after his alleged onset date, they noted that Plaintiff did exhibit continued PTSD symptoms, which could moderately affect his interpersonal relationships in the workplace, but he also had the ability to perform simple and repetitive tasks. [Tr. 216, 246, 277].

In addition, Plaintiff's medical record reveals that when he sought treatment and counseling for his PTSD, his symptoms and GAF score greatly improved. For instance, when Plaintiff visited a therapist in May 2005, more than a year after his final evaluation with Dr. Lindgren, he was diagnosed with a GAF score of 60. [Tr. 319]. A month later, in June 2005, Plaintiff's GAF score was 68. [Tr. 427]. Plaintiff also indicated that therapy helped him work through his issues. [Tr. 427]. On June 21, 2005, Plaintiff's GAF score was 70 to 75. [Tr.325, 326]. At that time, the doctor specifically noted that Plaintiff's "GAF score [was] the result of ongoing counseling, without which, it would likely be lower." [Tr. 326]. Following this evaluation, Plaintiff attended one more counseling session in July 2005. [Tr. 422-23]. At this session, his GAF score was diagnosed at 69. [Tr. 423]. Despite the significant improvement of his condition with ongoing counseling, Plaintiff did not seek treatment again for his PTSD until a year later in July 2006. [Tr. 393-96]. In fact, during an eye exam in March 2006, Plaintiff reported that he had not taken any medication or sought counseling for his PTSD since July 2005 [Tr. 403]. Nonetheless, Plaintiff also indicated he was still doing relatively well. [Tr. 403].

Thus, by comparing Dr. Lindgren's findings with those of the other physicians in the record, it is evident that there are inconsistencies in the doctors' conclusions. Therefore, the ALJ was permitted to afford Dr. Lindgren's findings significantly less weight. Accordingly, Plaintiff's argument is without merit.

**2.     Opinions of the DDS Consultants**

Plaintiff also challenges the ALJ's reliance on three DDS medical consultant opinions from Drs. Carraway, Buchin, and Raleigh. **[DE-22-2, p. 13-14]**. Specifically, he alleges that these "opinions only partially explain . . . [his] exertional RFC" because they did not represent the "full picture" of his non-exertional mental impairments. [DE-22, p. 14].The undersigned disagrees.

The evaluations by the DDS consultants took into account Plaintiff's mental impairments. For Dr. Carraway's assessment, he noted that Plaintiff continued to exhibit the symptoms of chronic PTSD and prominent histrionic personality traits. [Tr. 216]. Similarly, for Dr. Buchin's RFC assessment, he took into account Plaintiff's history of PTSD. [Tr. 242]. Likewise, for Dr. Raleigh's evaluation, she included Plaintiff's history with PTSD as well as the VA's three disability ratings. [Tr. 246]. Thus, while Plaintiff may disagree with the consultants' conclusions, his argument that they failed to consider his mental impairments in their assessments is without merit.

**3.The VA's Disability Determinations**

Plaintiff contends that the ALJ failed to consider the VA's decisions regarding his disability status. **[DE-22-2, p. 13]**. On August 22, 2003, the VA issued a rating decision that

Plaintiff's PTSD rendered him fifty percent (50%) service connected disabled. [Tr. 115-17]. In reaching this conclusion, the VA relied on the letter that Dr. Lindgren sent to the NCVA in May 2003. [Tr. 116, 155]. A year later, on June 15, 2004, the VA increased Plaintiff's service connected disability rating for PTSD to seventy percent (70%). [Tr. 121-23]. Shortly thereafter, on October 29, 2004, the VA concluded that Plaintiff was entitled to individual unemployability effective May 1, 2004 (a 100% disability rating). [Tr. 118-20].

"A decision by any . . . governmental agency about whether [a claimant] is disabled . . . is based on its rules and . . . is not binding on [the Social Security Administration]." 20 C.F.R. § 404.1404 (2008). However, while the VA's ratings are not binding on the Defendant, "the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases." SSR 6-03p, 71 FR 4559303; Best v. Astrue, No. 5:06-CV-301-D, 2008 U.S. Dist. LEXIS 312, *at 6-7 (E.D.N.C. Jan. 3, 2008) (concluding that the Commissioner has to explain the consideration, if any, given to another agency's decision); Owens v. Barnhart, 444 F. Supp. 2d 485, 492 (D.S.C. 2006) (noting that the ALJ is not bound by another government agency's decision, but "should be required to provide sufficient articulation of his reasons for [rejecting the decision] to allow for a meaningful review by the courts"). In his decision, the ALJ fails to explain the consideration, if any, he gave the VA's rating. "If the ALJ was going to reject the VA's finding, reasons should have been given, to enable a reasoned review by the court." Morrison v. Apfel, 146 F.3d 625, 626 (8th Cir. 1998). Therefore, this case should be remanded for further proceedings.

**Conclusion**

The undersigned specifically finds that the ALJ's determinations regarding the weight given Plaintiff's treating physician's opinion and the medical opinions of the DDS consultants were supported by substantial evidence. Nonetheless, because the ALJ failed to analyze the VA's disability determinations, the undersigned RECOMMENDS that Plaintiff's Motion for Judgment on the Pleadings **[DE-22]** be DENIED IN PART AND GRANTED IN PART, and that Defendant's Motion for Judgment on the Pleadings **[DE-25]** be DENIED IN PART AND GRANTED IN PART. Specifically, it is RECOMMENDED that Defendant's final decision be REVERSED AND REMANDED to permit an ALJ to make specific findings regarding the VA's disability ratings.

DONE AND ORDERED in Chambers at Raleigh, North Carolina this 18th day of November, 2008.

_____
William A. Webb
U.S. Magistrate Judge